Eugene SIEWERT, Claimant and Appellee,

v.

NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellant,

and

Siewert's Jack & Jill, Respondent.

Civil No. 960074.

Supreme Court of North Dakota.

Oct. 22, 1996.

Kathryn L. Dietz (argued), of Dietz & Little, Bismarck, for claimant and appellee.

Brent J. Edison (argued), Special Assistant Attorney General, of Zuger Kirmis & Smith, Bismarck, for appellant.

MESCHKE, Justice.

The North Dakota Workers Compensation Bureau appeals from a district court judgment reversing the Bureau's order terminating Eugene Siewert's benefits and requiring him to repay all benefits received. We conclude the Bureau's finding that Siewert was not injured in a work-related accident is not supported by the greater weight of the evidence, and we affirm.

Siewert claimed he was injured on March 20, 1990 when he fell from a stepladder on the tailgate of his pickup while fixing an outside flood light on his grocery store in Elgin. The Bureau accepted liability and paid related medical expenses and disability benefits. Later, after receiving medical reports indicating Siewert might be malingering, the Bureau investigated the claim, medically evaluated Siewert and, on August 24, 1992, entered an order terminating benefits and requiring Siewert to repay $113,677.37 in benefits already received. Siewert requested a formal hearing. After much delay and an evidentiary hearing on September 23, 1994, the Bureau, by order dated May 15, 1995, adhered to its decision to terminate benefits and require reimbursement from Siewert.

Siewert appealed. The district court reversed the Bureau and remanded for reinstatement of benefits "or additional [f]indings related to [Siewert's] mental status vis a vis malingering or other medical phenomena not relating from his injuries of March 20, 1990." The Bureau appealed,[1] asserting a preponderance of the evidence supported its finding Siewert did not fall in a work-related accident and therefore did not have compensable injuries.

 Upon appeal from a district court's review of an administrative agency decision, we review the agency decision, rather than the decision of the district court, and we limit our review to the record before the agency, without deferring to the court's findings. *Naumann v. N.D. Workers Compensation Bureau*, 545 N.W.2d 184, 187 (N.D.1996). Under NDCC 28–32–19 and 28–32–21, we will affirm the Bureau's decision unless a preponderance of the evidence does not support its findings of fact, its findings do not support its conclusions of law, its conclusions do not support its decision, or its decision is not in accordance with the law. *Spangler v. N.D. Workers Compensation Bureau*, 519 N.W.2d 576, 577 (N.D.1994). When deciding

---

1. Siewert has not questioned the Bureau's right to appeal in this case. However, the right to appeal is a jurisdictional matter that we consider *sua sponte*. *Community Homes of Bismarck, Inc. v. Clooten*, 508 N.W.2d 364, 365 (N.D.1993). The district court reversed the Bureau's decision and remanded with instructions that the Bureau either reinstate benefits or make additional findings about malingering affecting his "mental status." However, the court did not expressly retain jurisdiction for the Bureau to receive and consider additional evidence under NDCC 28–32–18. Thus, we conclude the district court had nothing more to do in the case, and its judgment was both final and appealable under NDCC 28–32–21. *See Municipal Services Corp. v. State*, 483 N.W.2d 560 (N.D.1992).

whether a preponderance of the evidence supports the Bureau's findings, we do not reweigh the evidence or substitute our judgment for that of the Bureau. *Id.* Rather, as we explained in *Rooks v. N.D. Workers' Compensation Bureau*, 506 N.W.2d 78, 80 (N.D.1993), we determine only whether the Bureau's findings adequately explain its decision and are reasonably supported by the greater weight of the evidence.

The claimant carries the burden of proving by a preponderance of the evidence he is entitled to receive benefits from the fund. NDCC 65–01–11; *Nemec v. N.D. Workers Compensation Bureau*, 543 N.W.2d 233, 237 (N.D.1996). If the Bureau terminates benefits after initially accepting a claim, the claimant still has the burden of proving the right to continue receiving benefits. *Ollom v. N.D. Workers Compensation Bureau*, 541 N.W.2d 455, 456 (N.D.1995). However, under NDCC 65–01–11, the Bureau carries the burden of proving an employee is not entitled to benefits because "the employee's injury was caused by the employee's willful intention to injure himself."

The Bureau found Siewert did not fall from a ladder while working on March 20, 1990, and did not suffer head injuries "as the result of falling from a ladder." Those findings imply that Siewert self-inflicted his physical injuries, including bruises and scrapes, and thereafter fabricating his subjective injuries, including memory loss and cognitive deficits. The Bureau has the burden to prove Siewert self-inflicted the injuries he claims were caused by a work accident. NDCC 65–01–11. After reviewing the record, we agree with the trial court that a reasonable person could only find, from the greater weight of the evidence, that Siewert accidentally fell at work and was injured in the fall.[2]

On March 20, 1990, when Siewert was found unconscious, lying on the ground at the back of his store, the local ambulance crew was summoned immediately. An ambulance attendant found Siewert "lying at a 45 degree angle with his face or head against the building" totally unconscious, and with bruises on his head. The ambulance crew took Siewert to the Elgin Hospital, where Dr. S.K. Patel examined him. Dr. Patel ordered Siewert transferred by ambulance to St. Alexius Hospital in Bismarck.[3] The Elgin nurse who rode with Siewert to Bismarck said Siewert was unconscious the entire time and completely limp with no response to painful stimuli. An ambulance attendant who also rode to Bismarck told the Bureau's investigator there was "no chance of Mr. Siewert faking unconsciousness."

When Siewert regained consciousness at the hospital, about 24 hours later, he could not remember the accident and was confused. He did not recognize his wife or daughter, and could not remember the alphabet or how to count. He complained of headaches, dizziness, and memory loss. He was extensively evaluated and treated at the hospital until his discharge on May 1, 1990. From June 25, 1990 to October 12, 1990, Siewert was hospitalized at St. Luke's psychiatric department in Fargo.

Dr. A.F. Samuelson conducted a psychiatric evaluation of Siewert at the St. Alexius Psychiatry Clinic. In a November 8, 1990, report Dr. Samuelson summarized Siewert's condition and treatment after the accident:

> This patient has retrograde amnesia stemming from a head injury in March during which he remained unconscious for a period of 24 hours. His memory and cognitive deficits took on a very unusual, bizarre quality for his preliminary neurological

---

2. The hearing officer limited the September 23, 1994 hearing to "whether the claimant sustained a compensable injury." In her appellate brief, Siewert's counsel argues: "The extent of injury is *not* properly an issue at this time. Even if Siewert exaggerated his injury at some point ... the issue in this appeal is whether there was an initial injury." The trial court neither addressed nor foreclosed the question of post-accident malingering, but remanded with instructions that the Bureau either reinstate Siewert's benefits or make additional findings about the extent of compensable injuries and the effect of any malingering.

3. Although it was not reflected in his medical notes, Patel later told an investigator that Siewert was apparently unconscious, but he would squeeze his eyes shut when the doctor brushed his finger over Siewert's eyelids so he may or may not have been faking unconsciousness.

evaluation at St. Alexius Hospital, revealed no objective findings consistent with severe brain injury. The neurological evaluation, electroencephalography, CT scan and MRI scan were negative. The diagnosis was thought to be that of a conversion hysteria and possibly malingering. He was discharged from St. Alexius, but returned within a few days and was subsequently referred to Fargo where he remained in the hospital for a period of several months under the care of Dr. Sharbo. The conclusions in Fargo after extensive neurological, neuropsychological evaluation and psychiatric observation were those of a psychogenic amnesia and possible malingering or a factitious disorder. While in the hospital he became exceedingly depressed and was placed on Prozac 60 mg daily....

Since his return home, he has continued to show evidences of severe memory deficit. He does not recognize people on the street, is not able to recall familiar events in his life and continues to demonstrate marked impairment of concentration and recent memory. He often leaves the burner burning, the sink running over with water and has not been able to follow through with tasks even of a simple nature.... [H]e remains exceedingly dependent upon his wife and she has been serving as his guardian. The only other medication he is now taking is Motrin a few times daily for pain.

\* \* \* \* \* \*

This individual is demonstrating a significant handicap no matter what the cause of his amnesia might be. Functionally he is not able to manage for himself and is very dependent upon his wife. Significant depressive symptoms are described and observed. The long term outcome remains very guarded.

Dr. Harold Hase conducted a psychological evaluation of Siewert on September 10, 1992. Dr. Hase concluded Siewert has a "generalized impairment in cognitive functioning" which "appears to be a consequence of his head injury."

Much of the testimony by Siewert's wife, Vicki Siewert, about her husband's medical condition is unrefuted. She said he had a bruise the size of a hamburger bun on his head and was scraped and bleeding on the left side when she saw him after the fall. She said her husband fractured a contact lens from the fall that had to be taken out of his eye, and a replacement was ordered. She also testified that her husband was incontinent during the entire time he was unconscious at St. Alexius hospital. She said his memory loss and confusion was so significant that she had to be named guardian for his personal affairs, and that she has had to have her sister stay with Siewert at home after his discharge from St. Alexius because he will "wander out the door and just start off for in the country." She also testified that since the accident Siewert's left leg gives out and "he has fallen down many, many times" causing him to get "all banged up." She said that the Fargo doctors concluded Siewert "compressed the left wrist and ... the medial nerve" when he fell and that Siewert had surgery to correct the problem.

Dr. Craig DeGree, a licensed psychologist at St. Alexius, was one of Siewert's primary treating doctors in the months following the accident. In DeGree's view, Siewert suffered a head injury from the fall that resulted in his considerable physical and psychological difficulties:

... [it] is very difficult to predict in mild traumatic brain injury, the subsequent loss in adaptive capabilities. The frontal areas of the brain that are involved in higher cognitive processes such as reasoning, planning, emotional modulation, etc. are the most susceptible, while at the same time the most difficult to access from a psychometric perspective. It seems fairly clear from the history that there was a substantial deterioration in Mr. Siewert's adaptive capabilities following the accident. It is my impression that he did receive a head trauma, which did produce an organic brain syndrome....

In Mr. Siewert's case, it is possible the head trauma has resulted in a decrease in his coping mechanisms, leading him to become depressed, or, directly resulted in an organic mood disturbance. Through my contact with him over the last three years,

he displays many of the characteristics seen in individuals with organic personalty dysfunction. He is irritable, suspicious, has problems with mood instability, and displays deficits in attentional areas....

The Bureau became suspicious of the legitimacy of Siewert's disability because some of the doctors who evaluated or treated Siewert reported inconsistencies in Siewert's physical symptoms and claimed memory loss that suggested possible malingering. The Bureau had Siewert reevaluated and relies primarily on the opinions of Dr. Judith F. Kashtan and Dr. Marvin Firestone.

Dr. Firestone is a California physician specializing in neuropsychiatry. He did extensive testing and evaluation of Siewert on September 24, 1993. He testified Siewert has from the outset of this case presented bizarre behavior and inconsistencies that lead him to conclude Siewert is malingering and that, with reasonable medical certainty, Siewert's symptoms are not caused by a head injury sustained in a fall or other accident. Dr. Firestone explained that Siewert's complaints about loss of childhood memory are not consistent with the kind of amnesia one gets with a brain injury from a fall. He also said Siewert appears to be faking arm weakness.

But not all of Dr. Firestone's conclusions are adverse to Siewert's work injury claim. Dr. Firestone was unwilling to conclude that Siewert did not fall at work or that he did not sustain some injury from such a fall:

A ... I have not made any conclusion with regards to whether or not he had, in fact, the initial head injury that's alleged, or if he did, what the cause of that was.

Q. Well, that's kind of my next question. Are you able to state, with reasonable medical certainty, that Eugene Siewert did not accidentally fall from a ladder on March 20th, 1990, striking his head?

A. I have no way of corroborating that, other than what's in the records, and I discussed that as thoroughly as I could.

Q. Can you say, with reasonable medical certainty, that there was no brain injury sustained on March 20th, 1990, by Eugene Siewert?

A. No. He, very well, could have had some minor or mild brain injury, but, you know, there's no way to detect those kinds of things, and all I do know is that the neurobehavioral syndrome that he presented is not consistent with a brain injury.

Dr. Firestone also testified that Siewert is definitely experiencing severe depression, that he is taking medication for it, and that both depression and medication can cause cognitive deficits and memory loss. So, Dr. Firestone agreed that, if the depression is causally related to Siewert's fall at work, his cognitive deficits and memory loss could be caused by the depression and the treating medication and, in that way, they can be causally related to the accident.

Dr. Judith F. Kashtan is a practicing psychiatrist in Minneapolis. She did a 45–minute evaluation of Siewert and also reviewed some, but not all, of Siewert's medical records. Dr. Kashtan concluded Siewert is fabricating symptoms, basing her opinion on the inconsistencies in Siewert's memory loss and other symptoms. She also diagnosed Siewert as suffering "from a mixed personality disorder with anti-social narcissistic, and passive-aggressive features," and she concluded that his behavior was not consistent with having suffered a closed head injury. In her deposition testimony, Kashtan acknowledged she did not review the ambulance report or any of Siewert's St. Alexius admission records. Kashtan testified "it's possible [Siewert] may have fallen down and hit his head. I'm not sure about that."

The record also contains unrefuted evidence that Siewert has had significant vision loss since the accident. His treating optometrist, Terry Schmidt, attributes Siewert's vision loss to a "direct result of his head injury" from falling off the ladder. Dr. Cynthia Knutson examined Siewert and noted that he can voluntarily move his eyes well to the left even though he has subjective complaints that he cannot follow moving objects to the left. Knutson diagnosed Siewert's eye condition as "conversion or a retinal problem." Dr. Firestone reviewed Knutson's report and concluded Siewert may be faking a left field deficit. However, when questioned by Siewert's attorney, Firestone conceded he was

unable to give an opinion about Siewert's eye problems because he did not examine Siewert's eyes.

The Bureau concluded Siewert never fell from a ladder by reasoning that Siewert must be faking certain cognitive deficits and memory loss because none of the medical tests show organic brain injury that could explain those problems. The Bureau claims its conclusion is also supported by evidence that Siewert was having financial difficulties before the accident, and by evidence that Siewert had become aware only a few days before the accident that the local volunteer fire department had discovered Siewert may have embezzled over $14,000 from them. The Bureau asserts Siewert's serious legal and financial problems gave him an incentive to fake injury to avoid legal charges and to alleviate his financial stresses with compensation benefits.

 The Bureau acts as both a factfinder and an advocate when considering a worker's claim for benefits, so it "must not place itself in a full adversary position to the claimant." *Hayes v. N.D. Workers Compensation Bureau,* 425 N.W.2d 356, 357 (N.D. 1988). Instead, the Bureau must consider the entire record, clarify inconsistencies, and adequately explain its reasons for disregarding medical evidence favorable to the worker. *Id.* In our view, the Bureau in this case has taken too much of an adversary position to the claimant. There is considerable evidence in this record that Siewert accidentally fell while at work on March 20, 1990, and that he sustained some injury from the fall. Much of that evidence is unrefuted, and the Bureau has not adequately explained its reasons for ignoring it.

The ambulance attendants said Siewert was totally limp after the fall and could not possibly have been faking unconsciousness. Several persons corroborated that Siewert was bruised and scraped from the fall, and his wife, who was close by during the 24 hours of unconsciousness, said he was incontinent during the entire time. It is unrefuted Siewert fractured a contact lens and incurred significant loss of vision following the accident. He also injured his wrist, necessitating corrective surgery. A reasonable person could not ignore all of this evidence and conclude there was no accident and no injury. Even Firestone and Kashtan, the doctors most relied upon by the Bureau, agreed Siewert may very well have fallen at work and sustained injuries then. Whether Siewert later decided to fabricate some symptoms is not a question for our review.

Dr. DeGree persuasively explains why the diagnosis of malingering from the outset is not reasonable in this case:

Dr. Firestone is attempting to make a case for malingering in regard to Mr. Siewert. He states in his report that the hallmark of malingering is a 'record of inconsistencies.' It should be acknowledged, however, that many of the inconsistencies noted in Mr. Siewert's background are also seen in individuals who have depression, hysterical reactions, and organic brain disorders. It is not uncommon for individuals who are severely depressed to have inconsistent and contradictory test findings. In Mr. Siewert's case, he has tremendous performance anxiety, and I suspect this has been a factor in some of his past evaluations.... [T]he more pertinent defining characteristics of malingering would be that of voluntary control of symptoms. The other conditions, in one form or another, tend to have symptoms that are either unconscious or involuntary. I do not see Mr. Siewert as presenting with voluntary symptoms for a number of reasons. Prior to the accident, he was a man of at least average to above-average intelligence. Why would he choose to present his symptoms in such a grossly inconsistent manner. In fact, the obviousness of the inconsistencies tends to argue more for a hysterical reaction or depressive disorder rather than malingering. Another facet of why I do not believe he is malingering is related to the fact that he has not only been cooperative in treatment, but he has made steady progress in regaining adaptive capabilities.... If he were malingering, why would he so obviously choose to improve.

We conclude the Bureau has not carried its burden of demonstrating Siewert intentionally injured himself and faked a work-related fall for purposes of collecting benefits. We

further conclude that a reasonable person could not find by the greater weight of the evidence that Siewert did not sustain injuries in a work-related fall on March 20, 1990. The extent of Siewert's workrelated injuries and whether he has fabricated symptoms since the accident were not subjects of the administrative proceedings and, accordingly, are not resolved by this appeal.

We affirm the judgment of the district court.

VANDE WALLE, C.J., and SANDSTROM, NEUMANN and MARING, JJ., concur.